**Phyllis Kay COKLEY, Respondent,**

v.

**CITY OF OTSEGO, a municipality, Appellant.**

**No. C7–00–1327.**

Court of Appeals of Minnesota.

March 6, 2001.

Review Denied May 15, 2001.

Robert D. Boedigheimer, Peter J. Horejsi, McCloud & Boedigheimer, P.A., Bloomington, MN, (for respondent).

Patricia Y. Beety, League of Minnesota Cities, St. Paul, MN, (for appellant).

Considered and decided by KALITOWSKI, Presiding Judge, HALBROOKS, Judge, and STONEBURNER, Judge.

## OPINION

STONEBURNER, Judge

This is an action by a former employee of the City of Otsego for damages under the Minnesota Whistleblower Act, Minn. Stat. § 181.932 (2000). After a jury verdict in favor of the employee, the City appeals from denial of its motions for JNOV and a new trial, and the district court's enhancement of the attorney-fee award. Because the employee did not engage in protected activity and failed to establish a causal link between her action and elimination of her position, we reverse.

## FACTS

The township of Otsego was incorporated into a city in 1990. When the township's clerk-treasurer retired in 1995, appellant the City of Otsego (the City) restructured its administrative staff. After several city council meetings and subcommittee meetings, in April 1995, the City employed respondent Phyllis Kay Cokley under a four-year contract, as the City's first business/finance director and director of economic development.[1]

Cokley's contract provided for three months advance notice of termination of her position and defined one of Cokley's duties as to more fully define her job duties, because both positions were newly created. A job description for business-finance director had been developed before Cokley was hired. In October 1995, Cokley prepared and presented to the city council a revised job description covering both positions. The city council never approved this version of Cokley's job description, and the previous job description for the business/finance director remained unamended to include any additional duties regarding the director of economic development position or more fully describe the actual duties Cokley was expected to perform. Both job descriptions included managing the City's payroll and pay equity issues, supervising OSHA mandate programs, and keeping informed on state and federal legislation as Cokley's responsibili-

---

1. Cokley, who responded to the City's advertisement for a business-finance director, had requested a salary higher than that expected by the City for that position. Because the City wanted to hire Cokley, they added the title of director of economic development to the position to justify the higher salary.

ty, but the evidence at trial established that she did not supervise OSHA programs. The exact scope of her duties was disputed at trial.

Cokley became aware that the city clerk and deputy clerk had a practice of scheduling a partial workday, using some vacation time for the hours not worked and then accruing overtime pay for attending evening city council meetings. Cokley, whose responsibilities included issuing checks based on submitted time cards, but not making a determination of the accuracy of those time cards, believed that this practice for accruing overtime did not conform to provisions of the Federal Labor Standards Act (FLSA). In January 1996, in the context of serving on a subcommittee to rewrite the City's personnel policy, Cokley submitted a memorandum to the city clerk who chaired the subcommittee, suggesting changes to the policy about work hours and how overtime was earned and paid. The memorandum states: "[t]he City's personnel policy discusses employees to whom the Federal Fair Labor Standards Act [FLSA] applies, and yet past procedures regarding overtime and compensatory time have not been in conformance with the Act."

At about the same time in January 1996, Cokley discussed her concerns regarding FLSA requirements and the clerk's and deputy clerk's practices with councilmember Ronald Black, who was also on the subcommittee.[2] According to Cokley, Black, an attorney, told her that her interpretation of FLSA requirements was correct, but he advised her to "leave it alone" because the City had "bigger problems" and the "mayor has his head in the sand" and "somebody's going to get hurt." There is no evidence that Cokley raised concerns about the FSLA after January 1996.

Duane Fiedler, a city maintenance employee, self-initiated an OSHA compliance review for the City in 1994 and reported his results to the city council at that time. Fiedler knew Cokley before the City hired her. Fiedler discussed his OSHA concerns with Cokley. Cokley did not independently verify any of Fiedler's concerns because, she testified, it was not her responsibility. She did, however, arrange a lunch with Fiedler, and councilmember Black in May 1996, at which time Fiedler again expressed his concerns about OSHA compliance. Cokley may have also discussed Fiedler's concerns with councilmember Fournier.

In May 1996, Cokley attended a League of Minnesota Cities Insurance Trust Loss Control Workshop. She submitted a memorandum to the city council summarizing material contained in the sessions of the workshop that she attended. The memorandum notes that the workshop offered tracks in administration, public works, small cities and parks and recreation, and states: "I attended sessions that I thought were most beneficial to the [C]ity in both the administrative and small cities tracks." One session involved OSHA training requirements. The memorandum states that the City "**must** provide training and be able to document that training has occurred," outlines "the 14 most cited training standards for the public sector" discussed, and concludes that "[s]afety **training must be done and must be documented.**"

One of Cokley's undisputed duties was to review and recommend insurance carriers and act as liaison between the City and its insurance carriers in order to limit exposure and meet statutory requirements. In early 1996, prior to the annual insurance audit that usually occurred in February or March, Cokley became concerned that the building inspector, who was classified as an independent contractor rather than an employee, had not provided a certificate of insurance. Based on

---

**2.** Cokley testified that she had reported similar concerns to councilmember Larry Fournier, who was also a member of the subcommit-

tee. Fournier testified that he did not recall any conversations or memos from Cokley regarding the FLSA.

her knowledge and experience, Cokley believed that the building inspector should have been classified as an employee, because he worked out of city hall and was provided with a desk and telephone and code books by the City. Cokley testified that she talked to councilmember Black about not having an insurance certificate for the building inspector and about her concerns that the position was misclassified. Cokley could not recall when this conversation occurred. Cokley testified that if PERA had determined the position should be classified as an employee, the City could have been penalized for not making contributions to the public employee retirement fund, but there is no evidence that she shared this specific concern with Black or any other member of the council.

At trial, Cokley was asked by her attorney: "Did you consider the classification of the building inspector to be unlawful in terms of the independent contractor laws in Minnesota?" to which she responded: "Yes." No evidence of any such law or regulation was provided. Cokley was asked: "Did you suggest to the City that they reclassify him?" She responded: "I suggested to the City in that memorandum that they needed to address that issue." The memorandum to which Cokley referred is the summary of the workshop described above. In her summary of a session titled "A Cure for the Common CODE" that covered "the current law in Minnesota regarding building inspections," Cokley wrote: "If the [C]ity has a contracted building inspector, the building inspector must have insurance and indemnify the [C]ity." And, in a summary of the workshop highlights, Cokley wrote, in bold:

Require independent contractors to carry insurance indemnifying the [C]ity. They must be careful on advise [sic] and suggestion and not act as a consultant regarding building code regulations.

There is nothing in the memorandum about classification of building inspectors as employees or independent contractors.

In November 1996, a new mayor and two new city councilmembers were elected. Cokley wrote a note to the new mayor on November 6th, congratulating him on his election:

I hope you will find time during this interim period to meet with me, to allow me to understand the ideas you want to bring forth as mayor, and to allow me to discuss various issues that I feel are of concern.

At the November 12, 1996 city council meeting, councilmember, mayor-elect Fournier read a prepared statement about the need for reorganization and a city administrator. Fournier moved to eliminate Cokley's position, contract out the financial duties performed by Cokley and use the savings to fund the position of city administrator. The city council, without any discussion, voted unanimously to proceed with Fournier's proposal. On the recommendation of the city attorney, the council immediately placed Cokley on administrative leave and scheduled a public hearing for November 19, 1996 to give Cokley an opportunity to respond to the reorganization proposal. At the November 19th meeting, Cokley, through counsel, focused not on whether Cokley's position should be eliminated, but rather on the process leading up to the proposal and adoption of the motion to eliminate the position. At this meeting the city council voted unanimously in favor of the reorganization proposal. Cokley's position was eliminated and she was provided with a three-month-severance package.

In 1998, Cokley sued the City under the Minnesota Whistleblower Act, Minn.Stat. § 181.932 (2000). The City moved for summary judgment on the ground that Cokley had failed to establish, as a matter of law, that she had engaged in protected activity under the Act. The district court denied the motion, and the case was tried to a jury. The district court denied the

City's motion for a directed verdict at the close of Cokley's evidence and the jury returned a special verdict, finding Cokley had made a good faith report of an actual or suspected violation of law and that the City eliminated her position in retaliation for making this report. The jury awarded Cokley damages.

The City moved the court to grant JNOV, a new trial, and remittur. The district court denied the City's motions for JNOV and a new trial, granted its motion for remittur in part, entered an order for judgment on the jury's verdict, and awarded Cokley costs and attorney fees with an upward enhancement on the traditional lodestar amount. The City appeals the district court's denial of its motions for JNOV and a new trial, and the district court's enhancement of the attorney-fee award.

## ISSUES

I. Did Cokley engage in protected activity under the Whistleblower Act?

II. Did Cokley provide evidence of causation sufficient to withstand a motion for a directed verdict or JNOV?

III. Did the district court's failure to give a special jury instruction defining a good-faith report result in substantial prejudice to the City?

IV. Did the district court err in granting an enhancement to the amount of attorney fees awarded to Cokley?

## ANALYSIS

The City argues that the district court erred in failing to grant its motion for JNOV, because Cokley failed to make a prima facie case under the Minnesota Whistleblower Act, Minn.Stat. § 181.932, subd. 1(a) (2000).

■ This court reviews the denial of a motion for JNOV de novo. *Pouliot v. Fitzsimmons,* 582 N.W.2d 221, 224 (Minn. 1998). "The evidence must be considered in the light most favorable to the prevail-

ing party and an appellate court must not set the verdict aside if it can be sustained on any reasonable theory of the evidence." *Id.* (citation omitted).

The Whistleblower Act prohibits retaliation against an employee who "in good faith, reports a violation or suspected violation of any federal or state law * * * to an employer or any governmental body or law enforcement official." Minn.Stat. § 181.932, subd. 1(a). Minnesota courts have adopted the *McDonnell Douglas* analysis: the employee has the initial burden to establish a prima facie case, and the burden of production then shifts to the employer to articulate a legitimate, non-retaliatory reason for its action, after which the employee may demonstrate that the employer's articulated reasons are pretextual. *See McDonnell Douglas Corp. v.. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569, 572 (Minn.1987). At all times the employee has the burden to prove by a preponderance of evidence that the employer's action was for an impermissible reason. *Phipps,* 408 N.W.2d at 572.

■ To establish a prima facie case of retaliatory discharge, the employee must show: "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 444 (Minn.1983). The City argues that Cokley failed to prove statutorily-protected conduct and causation between her conduct and elimination of her job. We agree.

### I.

■ Whether an employee made a report in "good faith" is a question of fact, but the court may determine as a matter of law that certain conduct does not constitute a report for purposes of the Whistleblower Act. *Rothmeier v. Investment Advisers, Inc.,* 556 N.W.2d 590, 593 (Minn. App.1996), *review denied* (Minn. Feb. 26,

1997). Cokley claims that she reported three issues: the City's employees were claiming overtime not authorized under the Federal Labor Standards Act (FLSA); the City was violating OSHA regulations; and the City's building inspector should have been classified as an employee rather than an independent contractor. To qualify as a report under the statute, a report must "blow the whistle" by notifying the employer of a violation of law that is a clearly mandated public policy. *See Obst v. Microtron, Inc.,* 614 N.W.2d 196, 200 (Minn.2000) (determining whether plaintiff reported a violation of law); *Hedglin v. City of Willmar,* 582 N.W.2d 897, 902 (Minn.1998) (finding vague reports of reprehensible conduct, where no statute or rule is violated by such conduct, are not reports); *Donahue v. Schwegman, Lundberg, Woessner & Kluth, P.A.,* 586 N.W.2d 811, 815 (Minn.App.1998) (holding complaint of internal payroll deduction practices did not implicate public policy). As a matter of law, the January 15, 1996 memorandum proposing changes to the personnel policy and the May 3, 1996 memorandum summarizing the sessions Cokley attended at the League of Minnesota Cities Insurance Trust Loss Control Workshop do not meet the requirements of a report under the Act and should not have been submitted to the jury for a determination of good faith. The evidence of Cokley's conversations with individual councilmembers about her concerns was also insufficient to meet the reporting requirement of the Act.

**FLSA concerns**

In January 1996, while serving on a subcommittee charged with reviewing the City's personnel manual, Cokley prepared a memo to the city clerk, who chaired the subcommittee, suggesting changes to the personnel manual to bring practices into compliance with the manual or vice-versa. Cokley had several conversations with councilmember Black about her interpretation of the overtime requirements in the FLSA. Cokley testified that Black agreed with her interpretation but told her to "leave it alone" because there were "bigger problems," that the "mayor had his head in the sand," and that "somebody's going to get hurt."

The two-page January 1996 memo, prepared in the context of Cokley's participation on a subcommittee to address changes to the personnel policy manual, contains a single sentence in the middle of a paragraph on the second page:

> The City's personnel policy discusses employees to whom the Federal Fair Labor Standards Act applies, and yet past procedures regarding overtime and compensatory time have not been in conformance with the Act.

As a matter of law, this non-specific reference to past practices not in conformance with the FLSA is insufficient to implicate a current violation of law or public policy. *See Donahue,* 586 N.W.2d at 813–14 (finding mere mention of a suspected violation amounted to a complaint of acknowledged firm practice and not a report under the statute). The evidence of Cokley's conversations with councilmember Black about FLSA and the practices of the city clerk and deputy city clerk regarding overtime also took place in the context of Cokley's participation on the subcommittee addressing revisions to the personnel policy manual. Cokley discussed with Black her opinion that non-exempt employees were receiving benefits not mandated by the FLSA. Cokley testified that she was aware that the FLSA provided a minimum standard and that cities could give greater benefits than provided in the FLSA. There is no evidence that Cokley pursued this issue beyond the discussions that occurred in early 1996 in the context of the subcommittee or that she addressed with councilmember Black or any other councilmember a violation of law that implicated public policy. *See Hedglin,* 582 N.W.2d at 902 (finding vague reports of conduct not in violation of a statute or rule are not a report).

### OSHA concerns

Cokley's involvement in Fiedler's OSHA concerns consisted of a lunch meeting with Fiedler and Black, during which Fiedler discussed his concerns, and possibly a conversation with Fournier about Fiedler's concerns. When Cokley became involved the OSHA issues were not new to the city council, because Fiedler had presented these issues to the city council in January or February of 1994. *See Rothmeier*, 556 N.W.2d at 593 (finding mention of suspected violation already acknowledged by employer not a report); *see also Obst*, 614 N.W.2d at 203 (finding employer already knew of safety violations).

In her May 3, 1996 memo, titled "League of Minnesota Cities Insurance Trust Loss Control Workshop," Cokley summarized for the councilmembers the sessions of the workshop Cokley attended, including sessions about OSHA requirements. The memo outlines OSHA requirements as taught at the workshop but does not assert that the City was in violation. In fact, several of the requirements addressed in the memo are not applicable to the City. The memo speaks for itself and is clearly informational: "I have handout information on all of the issues discussed * * *. Should you be interested in copies of this information, please let me know." *See Obst*, 614 N.W.2d at 203 (emphasizing good-faith report depends on content of report and purpose in making report). The record contains no evidence that Cokley discussed OSHA issues with anyone after the May 3, 1996 memo was distributed or that she pursued conversations with anyone about Fiedler's concerns after that date.

### Building Inspector classification

Cokley's concerns about the building inspector first centered on the lack of an insurance certificate, an issue that, she testified, was part of her job description. Based on her reading and experience in other cities, Cokley developed a conviction that the building inspector was mis-classified as an independent contractor and that

the position should have been classified as an employee. She discussed this concern with councilmember Black in early 1996. Although Cokley testified that she prepared a memorandum that discussed this concern and suggested in the memorandum that the City needed to address this issue, the memorandum she refers to is the May 1996 summary of workshop sessions she attended. On the fourth page of the memorandum, Cokley stated: "If the [C]ity has a contracted building inspector, the building inspector must have insurance and indemnify the [C]ity." In bold under the highlights of the workshop section, Cokley wrote:

> Require independent contractors to carry insurance indemnifying the [C]ity. They must be careful on advise [sic] and suggestion and not act as a consultant regarding building code regulations.

Cokley's memo does not alert the council to the concern that Cokley expressed at trial, that the building inspector's classification was in violation of "independent contractor laws in Minnesota," PERA requirements, or any other laws or regulations. *See Obst*, 614 N.W.2d at 200 (stating reported conduct must at least implicate a violation of law). There is no evidence that Cokley pursued this concern beyond her reference to insurance in the May 1996 memo. Neither the memorandum nor the concerns Cokley expressed to Black report a violation of any law or regulation and do not, as a matter of law, qualify as protected activity under the Whistleblower Act.

### II.

In addition to failing to prove that she engaged in protected conduct, Cokley has failed to produce any evidence of causation between her alleged conduct and the elimination of her position. We are mindful that retaliatory motive is difficult to prove by direct evidence and that an employee may demonstrate a causal connection by circumstantial evidence that justifies an inference of retaliatory motive.

*Dietrich v. Canadian Pac. Ltd.*, 536 N.W.2d 319, 327 (Minn.1995). Speculation, however, is not circumstantial evidence. A fact is proved by circumstantial evidence when its existence can *reasonably be inferred from other facts proved in the case.* 4 *Minnesota Practice*, CIVJIG 12.10 (1999). " 'Inferences must * * * be reasonably supported by the available evidence; sheer speculation is not enough.' " *Illinois Farmers Ins. Co. v. Brekke Fireplace Shoppe, Inc.*, 495 N.W.2d 216, 221 (Minn.App.1993) (quoting *Rochester Wood Specialties, Inc. v. Rions*, 286 Minn. 503, 509, 176 N.W.2d 548, 552 (1970)). In this case, Cokley has presented a theory of causation based on conjecture, not premises of fact from which a causal connection can be inferred.

As is clearly demonstrated from the nature of her concerns and the manner in which she addressed them, Cokley did not intend to blow the whistle until after her job was eliminated, at which point she seized on the theory to explain the abrupt, seemingly arbitrary elimination of her job. She pressed this theory upon newly-elected councilmember Mark Berning, who had no knowledge of Cokley's activities prior to the elimination of her job, other than as related by Cokley. When Berning called Cokley the day after her job was eliminated, Cokley outlined her theory to Berning. Cokley made contemporaneous notes *of her own statements* during this conversation, which were presented at trial as independent evidence of retaliation for whistleblowing.

■ Close proximity between a complaint of discrimination and a termination decision has been held to support an inference of reprisal. *See Thompson v. Campbell*, 845 F.Supp. 665, 675 (D.Minn.1994) (holding that termination four months after plaintiff filed a complaint, together with other circumstantial evidence in the record, raised an issue of material fact concerning the causal connection between protected conduct and termination); *Dietrich*, 536 N.W.2d at 327 (stating that a

causal connection may be established by the proximity in time between a statutorily protected act and an adverse employment action). At trial, Cokley's counsel characterized the congratulatory note she wrote to the mayor-elect as "making waves right up to the final days before she gets fired." In her brief she states that the "evidence confirmed" that she wrote Fournier to "discuss her concern regarding the violation of laws only a few days before she proposed to eliminate her position." Cokley asserts that the proximity of this note to the elimination of her job constitutes evidence of causation. The note speaks for itself. The note does not mention or suggest any violations of law by the City. No evidence links the remarks in this note to Cokley's concerns about FLSA, OSHA or the building inspector's classification. As a matter of law, a letter that does not reference any concerns about violations of law is not a whistleblower report protected under the statute, and its proximity to the elimination of Cokley's job does not constitute relevant evidence of causation to support a whistleblower claim. *See Obst*, 614 N.W.2d at 200 (holding reported conduct must at least implicate a violation of law).

Cokley argued that evidence that the council held several meetings and subcommittee meetings before deciding to hire her, contrasted with a lack of any discussion prior to approval of the motion to pursue elimination of her position, demonstrates causation. Although this evidence may show that the council acted precipitously, only speculation links the council's quick decision with the information Cokley had provided many months earlier.

■ Cokley also argued that the city attorney's characterization of the decision to eliminate Cokley's position as a "political decision," rather than an "economic decision," (made in a conversation with newly-elected councilmember Berning) is evidence of retaliation by the city council. No evidence supports this assertion. A political decision to eliminate a position is not prohibited by the whistleblower stat-

ute, even if the decision has been characterized as an economic decision at the time that it was made. A political decision is not a synonym for retaliation and is not evidence of retaliation. Cokley cannot question the motivation of the city council until she has demonstrated some evidence of causation.

Cokley argues that phone calls by Fournier and the city attorney to other councilmembers to line-up support for the motion for reorganization and the city council's unwillingness to answer questions or submit to cross-examination at the November 19, 1996 meeting about their support for this proposition are further evidence of causation linking elimination of her position to her alleged reports. Cokley suggests that because she impeached the City's witnesses about the phone calls and because the council was not willing to submit, on November 19th, to cross-examination about their motivation for reorganization, the jury is free to speculate that there was a causal connection between information she had provided in the first six months of 1996 and the reorganization approved after the November 1996 election. Again, Cokley relies on speculation, not evidence.

The district court erred by failing to direct a verdict for the City at the close of Cokley's evidence, placing the jury in a position of determining whether the reasons for reorganization advanced by the City were "pretext" without requiring Cokley to make a prima facie case under the Whistleblower Act. Cokley's counsel adeptly used this error to his advantage, successfully persuading the jury to substitute speculation for evidence. Once the verdict was in, the district court erred by failing to grant judgment notwithstanding the verdict, because Cokley did not engage in protected activity and failed to present evidence beyond speculation to show any causal link between the concerns she had expressed several months earlier with the decision to eliminate her position. Viewing that evidence in the light most favorable to the verdict, judgment for Cokley cannot be sustained on any reasonable theory.

Because the case should not have been submitted to the jury, we do not reach the issues of jury instructions or the enhancement of attorney fees.

### DECISION

The district court erred by failing to grant judgment notwithstanding the verdict where Cokley did not engage in protected activity and failed to present evidence beyond speculation to show any causal link between the concerns she expressed and the decision to eliminate her position.

**Reversed.**