Jong LEE, Appellant,

v.

REGENTS OF the UNIVERSITY
OF MINNESOTA, et al.,
Respondents.

No. A03–381.

Court of Appeals of Minnesota.

Nov. 25, 2003.

Richard T. Wylie, Minneapolis, for appellant.

Mark B. Rotenberg, General Counsel, Brian J. Slovut, Associate General Counsel, Office of the General Counsel, Minneapolis, for respondents.

Considered and decided by WRIGHT, Presiding Judge, HARTEN, Judge, and G. BARRY ANDERSON, Judge.

## O P I N I O N

### G. BARRY ANDERSON, Judge.

Appellant Jong Lee challenges the district court's grant of summary judgment arguing that (1) the district court was correct in determining the court had jurisdiction to review the Phase III panel decision; (2) the district court erred in determining the Phase III panel decision did not create enforceable contract rights; (3) the Minnesota Uniform Arbitration Act ("UAA"), Minn.Stat. § 572.18 (2002), and the Public Employee Labor Relations Act ("PELRA"), Minn.Stat. § 179A.13, subd. 1 (2002), apply to a Phase III panel decision; (4) the district court erred in dismissing Lee's wrongful eviction claim because she was not given proper notice; and (5) the district court erred in dismissing her whistleblower claim because the university retaliated against her when it chose not to inform university employees of the directive stated in the Phase III panel's decision. Because we conclude that the district court did not err in its decision to grant summary judgment on all counts, we affirm.

## FACTS

Appellant Jong Lee was an employee of the University of Minnesota's Medical School from 1987 through 1998. Appellant is both female and a United States citizen of Korean national origin. Respondent university employed the other named respondents at various times and in various capacities.

In 1992, the university hired appellant as an unpaid visiting scholar in Dr. John Winklemann's lab. While there, Winklemann permitted appellant to work on appellant's protein project focusing on the development of pure human antibodies. Appellant showed Winklemann a report about her development and claims that Winklemann took a sample, along with her paper reporting her invention, and used the information without appellant's authorization in a 1993 grant proposal. Appellant reported the incident to the university, but to no avail. After a second objection, a university patent attorney allegedly determined that the protein invention was in fact appellant's. In June 1993, the university waived its rights to commercialization of the invention, and that same year, appellant applied for a patent, subsequently granted in 1998.

In August 1994, Dr. Thomas F. Ferris (a named defendant) and Dr. Silvia Azar appointed appellant to a 20% research associate position in the Renal Diseases and Hypertension Division in the Department of Medicine. Her position was temporary and annually renewable. Appellant contin-

ued her own experiments in Azar's lab on her own time, with her own money, and with Azar's permission. She continued to produce the antibodies, which she stored in the ultra-cold freezer in Azar's lab.

Within the next six months, appellant presented two grant proposals for research funding; both were subsequently denied. Dr. Hostetter, on behalf of the university, informed appellant on March 15, 1996, that her position would not be renewed for the fiscal year beginning July 1, 1997. On or about April 26, 1996, appellant filed a grievance arising out of the non-renewal and also challenged Hostetter's denial of her grant proposals. On May 29, 1996, Hostetter withdrew the employment termination but required appellant to fund her own position.

On October 3, 1996, appellant filed a complaint with the University's Academic Advisory Committee, alleging academic misconduct by Winklemann, claiming Winklemann's grant application included her work without her authorization. After an investigation, it was determined that Winklemann committed neither academic misconduct nor any other inappropriate professional behavior.

On January 7, 1997, Frank Cerra, the Provost for the Academic Health Center, reinstated appellant to her previous position with back pay. Appellant then withdrew her grievance on February 6, 1997. Appellant continued to work in her position with no relevant events occurring for over a year. Then, on June 26, 1998, the university notified appellant that her position would not be renewed as of September 30, 1998. On August 11, 1998, appellant filed an internal grievance under the university's procedures, alleging the termination of her position was based on retaliation and discrimination. She also objected to the monitoring of her daily activities and limitations on her laboratory access, and she asserted the existence of a hostile work environment. Appellant sought reinstatement to her position with full grant application opportunities, lab access, and other relief.

The University Grievance Policy ("UGP") provides for four phases of review. Phase I is an informal meeting between the grievant and the administrator responsible for the challenged decision. Phase II is a meeting between the grievant and the supervisor of the administrator. Phase III is a hearing before a three-person panel with limited powers. The panel may grant back pay, restore benefits actually lost, and reinstate the employee. Phase IV is arbitration.

On August 25, 1999, a three-member Phase III panel heard appellant's grievance. The panel issued a report on October 15, 1999, upholding appellant's termination and declining to reinstate the appellant. The panel concluded that there was "no clear evidence that the [appellant] was discriminated against on the basis of ethnicity or gender, or that the [appellant] was retaliated against by the [u]niversity." The panel, however, noted that although no rules were violated, there was "persuasive evidence of undesirable professional behavior toward the [g]rievant and lack of guidance of the [g]rievant." The decision of the panel was as follows:

(1) the University has violated no regulations, and that no relief be granted to the Grievant, and

(2) that the Medical School be directed to refrain from impeding the Grievant's professional future, either within or outside the University of Minnesota.

The University Grievance Officer notified appellant in a memorandum that "[i]f the Phase III panel decision is favorable to the grievant, the [u]niversity will implement it.... If the decision ... is not favorable to the grievant, the grievant may choose to proceed to Phase IV arbitration...." Ap-

pellant did not appeal the decision to Phase IV arbitration.

After the panel issued its decision, appellant continued to use Azar's lab both for her own work and to help Azar with her research. Before January 2000, the university never demanded rent from appellant for the lab, never asked her to leave, and never brought a court action to have her vacate. By January 2000, appellant had collected over 28,000 ml of antibodies requiring storage in an ultra-cold freezer. Then, because of planned remodeling, the university posted a sign on the laboratory doors stating, "Construction is to begin in these laboratories. Locks will be changed and access denied as of January 31, 2000. Please have any personal belongings removed by that date." Appellant located a replacement for the ultra-cold freezer she had been using in Azar's lab, found lab space near the university, and purchased replacement equipment to continue her work. Approximately a month after the university's deadline to move from the premises, the replacement freezers failed and most of her samples were destroyed. Appellant never complained that the notice to vacate was inadequate, and she did not seek a remedy from the university until after the replacement freezers malfunctioned.

### ISSUES

I. Did the district court properly dismiss appellant's claims for the alleged failure to comply with the grievance decision?

II. Did the district court properly dismiss appellant's claim for wrongful eviction?

III. Did the district court properly dismiss appellant's whistleblower claim?

### ANALYSIS

On appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact and (2) whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). A motion for summary judgment shall be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03; *Asmus v. Ourada*, 410 N.W.2d 432, 434 (Minn.App.1987). "On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993) (citation omitted). A genuine issue of material fact exists when the nonmoving party presents evidence that creates a doubt as to a factual issue that is "probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn.1997). "[T]he party resisting summary judgment must do more than rest on mere averments." *Id.* A genuine issue for trial must be established by substantial evidence. *Id.* at 69–70.

■ Whether a court has subject-matter jurisdiction is a question of law and is reviewed de novo. *Handicraft Block Ltd. P'ship v. City of Minneapolis*, 611 N.W.2d 16, 20 (Minn.2000).

I. Dismissal of appellant's claims for the alleged failure to comply with the grievance decision

■ Respondents argue the district court lacked subject-matter jurisdiction to hear appellant's grievance-related claims because the university is entitled to defer-

ence in its decision-making and internal management processes, and because judicial review of Phase III determinations is only available by certiorari. *See Univ. of Minn. v. Woolley,* 659 N.W.2d 300, 306 (Minn.App.2003), *review denied* (Minn. Jun. 17, 2003). But in *Woolley,* where the court determined a Phase III decision was subject to certiorari review, the appellant did not have statute-based claims from which to appeal the Phase III decision.

■ Statutory claims are not limited to certiorari review, and are within the district court's jurisdiction. *See, e.g., Willis v. County of Sherburne,* 555 N.W.2d 277, 283 (Minn.1996) (claiming under the Minnesota Human Rights Act); *Woolley,* 659 N.W.2d at 303 (claiming under the Uniform Arbitration Act). The specific statutes need not be directly cited in the pleadings. *Abraham v. County of Hennepin,* 639 N.W.2d 342, 354–55 (Minn.2002). Here, appellant is not challenging the Phase III panel decision upholding her termination, but instead is bringing claims under the UAA, the PELRA, and under Minn.Stat. §§ 557.08 and 557.09 (2002) for wrongful eviction. Therefore, the district court was not limited to certiorari review, and had proper jurisdiction to hear the statutory claims. With respect to appellant's contract claim for violation of the panel decision, we conclude that because the claim does not involve an inquiry into the university's decision to terminate appellant's employment, but instead involves the university's alleged noncompliance with the panel's order directing the medical school to refrain from impeding appellant's professional future, the district court has jurisdiction to hear the claim. *See Navarre v. S. Wash. County Schs.,* 652 N.W.2d 9, 31–32 (Minn.2002) (stating respondent's claim for lost wages was not barred by her failure to pursue arbitration because she was not seeking to recover lost wages under her employment contract, but was seeking to recover lost wages for her alleged constructive discharge that resulted from alleged violations of the MGDPA). Therefore, we affirm the conclusion that the district court had jurisdiction to consider appellant's claims.

Respondent argues alternatively that even if "enforcement" could be separated from Phase III, appellant's claim would still fail because she did not exhaust her administrative remedies. Respondent states that because appellant's claim is that the university did not implement the Phase III decision, it is a claim that falls within the subject-matter of the University Grievance Policy ("UGP"). Therefore, appellant should be required to pursue the claim under that policy before seeking judicial review. This would require pursuing a grievance for the violation of the policy, and then seeking a writ of certiorari.

This court has recognized that a university employee challenging an adverse employment decision by the university "must exhaust the grievance process applicable to [the] position before seeking review by writ of certiorari." *Woolley,* 659 N.W.2d at 305 (citing *Stephens v. Bd. of Regents of Univ. of Minn.,* 614 N.W.2d 764, 774 (Minn.App.2000), *review denied* (Minn. Sept. 26, 2000)). But in *Woolley,* the court determined that a Phase III determination was a final administrative decision subject to review. 659 N.W.2d at 306. Because appellant's claim does not involve an inquiry into the university's decision to terminate appellant's employment, but instead involves the university's alleged noncompliance with the panel's order, the appellant may appeal the Phase III final decision, and is not limited to certiorari review.

■ Appellant contends that the Phase III order issued by the university panel, which included language instructing the

university not to "[impede her] professional future," granted her contractual rights enforceable against the university. The UGP provides as to Phase III:

> If the Phase III panel decision is favorable to the grievant, the University will implement it, unless the Senior Vice President for Academic Affairs delivers a written notice to the UGO and the grievant within ten (10) work days of the receipt of the Phase III panel's decision stating that the decision is not acceptable and the reasons why it is not acceptable. In this event, the grievant may request Phase IV arbitration.

> If the decision of the Phase III panel is not favorable to the grievant, the grievant may choose to proceed to Phase IV arbitration. If the Phase III decision is not acceptable to the University, or if it is not favorable to the grievant, the grievant must deliver a written notice of intent to proceed to Phase IV to the UGO and the Phase III University representative within ten (10) work days after the grievant received the Phase III hearing panel decision or the Senior Vice President's notice, whichever occurred last, unless there are compelling reasons for delay.

The policy also states, "[i]t is the responsibility of the [u]niversity to faithfully carry out its responsibilities under this policy, and to enforce the terms of any binding decision under this policy."

Appellant's argument, that the university had a binding obligation to provide facilities for her research as a result of the panel's order, is contrary to both the UGP and to the panel's decision. The UGP states that while it "does not, and is not intended to, create any legal rights for faculty members, students, staff, or other persons, and is not part of any contract between the [u]niversity and its employees or any other individual," an arbitration award "is legally final and binding on both the [u]niversity and the employee." Appellant did not proceed to Phase IV arbitration; according to the plain language of the policy, appellant did not obtain any legal rights.

The appellant also requested relief in the form of continued access to university facilities. The panel could not have been more clear; it denied all relief requested by appellant. Further, even if the panel wanted to confer certain rights on appellant, it was without authority to do so. The UGP limits the authority of the panel to granting "back pay and benefits actually lost, together with reinstatement." Creating a right, contractual or otherwise, of professional safe passage for appellant was beyond the jurisdiction of the panel and any apparent contract or right is void. *See, e.g., Martin v. Common Sch. Dist.,* 163 Minn. 427, 429, 204 N.W. 320, 320 (1925) (holding a teacher's ultra vires contract void).

Because the plain language of the UGP states that contractual rights are to be reserved for Phase IV determinations, and because the Phase III panel determined appellant was not entitled to relief, there are no material facts at issue. Therefore, we affirm the district court's conclusion that the panel decision created no rights for the appellant to enforce.

■ Appellant also challenges the dismissal of claims brought under the UAA and the PELRA. The UAA states that "[t]he making of an agreement described in section 572.08 providing for arbitration in this state confers jurisdiction on the court to enforce the agreement...." Minn. Stat. § 572.24 (2002). An "agreement" is "[a] written agreement to submit any existing controversy to arbitration...." Minn.Stat. § 572.08 (2002). Characterizing Phase III as "arbitration," as appellant essentially does, is contrary not only to the

plain meaning of the university's policy but also contrary to the instruction in *Woolley*, which found only Phase IV to be subject to the UAA, and proceedings prior to Phase IV reviewable only by certiorari. *See* 659 N.W.2d at 306. Additionally, there is no written arbitration agreement, a requirement of the UAA. *See* Minn.Stat. § 572.08. Appellant has no rights relevant to this proceeding under the UAA.

 The PELRA also does not apply because appellant has not met a condition precedent to a PELRA claim. Appellant failed to file a copy of the complaint with the Commissioner of the Bureau of Mediation Services at the time the complaint was filed with the district court. *See* Minn. Stat. § 179A.13, subd. 1. Appellant asserts that because the filing of the complaint is only a "procedural requirement," the university must show prejudice in appellant's noncompliance. This assertion is incorrect. The party challenging a district court ruling on a procedural requirement bears the burden of demonstrating prejudice. *See Midway Ctr. Assocs. v. Midway Ctr., Inc.*, 306 Minn. 352, 237 N.W.2d 76, 78 (1975) (noting unless the district court error is prejudicial, no grounds exist for reversal). A court must give effect to the plain meaning of statutory language.[1] *See State v. Iverson*, 664 N.W.2d 346, 350–51 (Minn.2003) (stating the best method of determining legislative intent is by relying on the plain meaning of the statute; the court will only look beyond the plain meaning if the text is ambiguous). Because appellant did not file a complaint with the commissioner, the PELRA claim fails, and we need not determine whether PELRA provides an enforceable right under the facts at issue here.

**II. Dismissal of appellant's claim for wrongful eviction**

 Appellant argues she was wrongfully evicted from the university lab she was utilizing for her personal research purposes. Appellant argues that she was a tenant-at-will, and could only be removed after receiving written notice one full calendar month prior to eviction. *Cf. Thompson v. Baxter*, 107 Minn. 122, 124, 119 N.W. 797, 798 (1909) (noting permission is all that is needed from an owner to create a tenancy-at-will; rent or other obligations are not needed). But to be a laboratory tenant, appellant would need a landlord and that landlord must possess the ability to convey to appellant an interest in the laboratory. *See Mid–City Hotel Assoc. v. Prudential Ins. Co.*, 114 B.R. 634, 641 (Bankr.D.Minn.1990) (stating a tenant "is one who *holds or possesses lands or tenements* by any kind of right or title, whether in fee, for life, for years, at will or otherwise") (emphasis added and citation omitted). While it is undisputed that Dr. Azar gave appellant permission to use the laboratory, appellant introduced no evidence regarding the relationship between Dr. Azar and the university showing that Dr. Azar had, or could convey to appellant, an interest in the laboratory, and the district court found that Dr. Azar lacked the authority to do so. Thus, the record currently before this court cannot support a determination that appellant is a tenant.

 If a licensee has property on the premises in question, she is entitled to "reasonable notice" of the revocation of her right to use the premises. *Ingalls v. St. Paul, Minneapolis & Manitoba Ry., Co.*, 39 Minn. 479, 481, 40 N.W. 524, 525 (1888). Here, the district court ruled that

---

1. The statute here reads: "A copy of any complaint alleging an unfair labor practice must be filed with the commissioner at the time it is brought in district court." Minn. Stat. § 179A.13, subd. 1.

**374**

appellant was a "guest" but applied the licensee "reasonable notice" analysis. The facts of this case make it clear that the appellant was a licensee rather than a guest. *Compare* Black's Law Dictionary 932 (7th ed.1999) (defining licensee as "[o]ne who has permission to enter or use another's premises, but only for one's own purposes and not for the occupier's benefit"), *with* Black's Law Dictionary 714 (7th ed.1999) (defining guest as "[a] person who is entertained or to whom hospitality is extended"). Therefore, while the district court incorrectly labeled appellant's status, it used the correct notice analysis by concluding appellant was entitled to reasonable notice. Here, appellant was given 12 days notice to leave the lab and she challenges the district court's determination that this notice was reasonable. While generally what is reasonable is a factual question precluding summary judgment, when the record allows only one conclusion on the subject, the question may be resolved as a matter of law. *See Abo El Ela v. State,* 468 N.W.2d 580, 582–83 (Minn. App.1991) (holding while negligence is usually inappropriate for summary judgment because it involves the jury's assessment of reasonableness and causation, a district court may enter summary judgment when the undisputed material facts compel only one conclusion as a matter of law).

Here, it is undisputed that (a) after receiving notice to leave the lab, appellant found an alternate freezer in which to store her samples; (b) despite her then-existing proceedings against the university, appellant did not allege that she was not given reasonable notice until after the alternate freezer failed, ruining most of her samples; and, (c) the failure of the alternate freezer is unrelated to the notice to leave the lab. On this record, we can conclude only that appellant's eviction claim was prompted not by the allegedly inadequate notice, but by the subsequent loss of her specimens in a freezer failure that was unrelated to the notice. Therefore, appellant has not shown the existence of a factual question regarding the reasonableness of the notice and we will not reverse the district court's grant of summary judgment on appellant's wrongful eviction claim.

III. Dismissal of appellant's whistleblower claim

Appellant asserts a cause of action under the Whistleblower Act because the university purposefully failed to instruct the medical school about the Phase III directive in retaliation against her for making complaints of academic misconduct. The Whistleblower Act makes it illegal to "otherwise discriminate against, or penalize" a whistleblower. Minn.Stat. § 181.932, subd. 1 (2002). The statute requires an employer-employee relationship. *See id.* ("An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee."). In order to present a prima facie case for whistle-blowing protection, there must be "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Cokley v. City of Otsego,* 623 N.W.2d 625, 630 (Minn.App.2001) (citation omitted), *review denied* (Minn. May 15, 2001).

Here, there is no adverse employment action. To satisfy the adverse employment action element, the employee must establish the employer's conduct resulted in a "material change in the terms or conditions *of her employment." Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997) (emphasis added). An "employee" is defined as a "person who performs services for hire in Minnesota for an employer." Minn.Stat. § 181.931, subd. 2

(2002). At the time appellant is alleging retaliation took place, appellant was no longer an employee. Appellant argues that whistleblower protection extends to former employees, citing litigation involving Title VII claims including *Robinson v. Shell Oil Co.*, 519 U.S. 337, 344, 117 S.Ct. 843, 848, 136 L.Ed.2d 808 (1997) (holding "employee" extends to former employees for retaliation purposes under Title VII), and *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1266 (8th Cir.1997) (noting that Title VII's protections from retaliation extend to former employees). But appellant's Title VII claims are not on appeal. Further, we held in *Guercio v. Prod. Automation Corp.*, 664 N.W.2d 379, 389 (Minn.App. 2003), that "the whistleblower act only applies to current employees" in Minnesota. Because we conclude that the Minnesota whistleblower act does not protect former employees, we need not consider whether appellant proved the other elements to establish a prima facie violation of the act, and because there are no material fact issues surrounding whether an adverse employment action took place, we affirm the district court's dismissal of the whistleblower claim.

## DECISION

The district court did not err in dismissing appellant's claims for the alleged failure to comply with the grievance decision, for wrongful eviction, or for violation of the Whistleblower Act.

**Affirmed.**