John GRUNDTNER, Appellant,

v.

UNIVERSITY OF MINNESOTA,
et al., Respondents.

No. A06–1137.

Court of Appeals of Minnesota.

April 24, 2007.

Stephen W. Cooper, Stacey R. Everson, The Cooper Law Firm, CTD, Minneapolis, MN, for appellant.

Brian J. Slovut, University of Minnesota, Minneapolis, MN, for respondents.

Considered and decided by DIETZEN, Presiding Judge; RANDALL, Judge; and HUDSON, Judge.

## OPINION

RANDALL, Judge.

Appellant appeals from the district court's grant of summary judgment for respondent-employer. Appellant argues that the district court erred in (a) granting

summary judgment on his whistleblower claim; (b) holding that it lacked jurisdiction over his common-law tort claims; and (c) requiring appellant to return documents based on attorney-client privilege.

## FACTS

Appellant John Gundtner, beginning in May 2000, was the University Architect at respondent University of Minnesota (university). Appellant entered a one-year contract subject to annual renewal at the university's discretion. As university architect, all design and construction staff members reported to appellant, and appellant managed all project issues and operations.

In September 2002, Kathleen O'Brien became Vice President of University Services and was in charge of the operations side of the university. Upon arrival, one of O'Brien's main goals was improving the university's design and construction functions.[1] O'Brien hired respondent Michael Perkins, an outside consultant, to effectuate improvements by reviewing the organizational structure and providing recommendations.[2]

In June 2003 the university hired Perkins as Associate Vice President of Capital Planning and Project Management (CPPM), the group responsible for the planning, design, and construction of capital improvement projects. Shortly thereafter, Perkins observed that the architecture group (led by appellant) and the planning group (led by Director of Planning Harvey Turner) were operating inef-

ficiently. This, and an upcoming budget reduction, caused Perkins to consider combining the two groups. A final solution was needed by January 2004.

The university was beginning a student center project on its Crookston campus. The university solicited construction bids but received only a single bid and that was significantly over budget. The bid was rejected. Appellant believed the consulting architect on the project was to blame and reported to Perkins in late October 2003 that the university should change architects. Perkins informed appellant that he would meet with the consulting architect to address the concerns. Appellant was unable to attend the meeting and, instead, received a follow-up report from Michael Denny, Director of Development. Denny informed appellant that Perkins decided to negotiate with the new low bidder once a new set of bids was solicited and submitted. Appellant immediately objected because negotiating with a low bidder constituted an illegal procurement method.[3]

On November 5, 2003, another meeting was held regarding the Crookston project. Appellant reiterated the illegality of Perkins's plan to negotiate with a low bidder. Appellant testified that Perkins and Denny were upset at this meeting with his persistence of the illegality of the proposed negotiation.

On the following day, November 6, 2003, Perkins informed appellant that he was relieving appellant of project management

1. The design and construction functions were plagued with cost overruns, deteriorating relationships with various professional industries, and negative media attention.

2. Perkins submitted his executive summary, dated January 2003, recommending a reorganization of the university's design and construction functions. Included amongst the

recommendations were the elimination of various director positions and the combining of groups within the design and construction functions.

3. Respondents conceded that if the university had followed through with the plan to negotiate with a low bidder such action would constitute a violation of state law.

responsibilities.[4] Appellant identified Perkins's move as a "sudden change"; however, the record shows that Perkins had previously contemplated the change and asked another employee in early—to mid-October 2003 about assuming project management and delivery responsibilities. During December 2003, Perkins removed appellant's sign-off authority to proceed. In January 2004, Perkins decided to combine the architecture and planning groups, thereby eliminating the director positions in both groups and creating a single director position. On March 1, 2004, Perkins informed appellant that his position was being eliminated as a result of the reorganization and that his contract would not be renewed. Perkins announced his reorganization plan, which involved, including appellant, terminating seven employees.

Meanwhile, on February 23, 2004, appellant met with Martell and informed her of the hostile and retaliatory work environment created by Perkins.[5] Appellant reiterated his concerns with the procurement method planned for the Crookston project as well as additional concerns regarding Perkins's actions. Martell instructed appellant to raise his concerns with Gail Klatt, Vice President of Internal Audit, which appellant did that same day.[6]

On March 17, 2004, the university and appellant entered a telecommuting agreement at the suggestion of Perkins, whereby appellant would work from home to complete three tasks by April 5, 2004.[7] As a result of the agreement, Perkins banned appellant from the university offices even though appellant was teaching a class. Under the agreement, Perkins required appellant to provide daily e-mail updates, but Perkins terminated appellant's e-mail access. After appellant complained, his access was restored.

During March and April 2004, appellant met with several individuals, including Martell, O'Brien, and human resources, to discuss Perkins's proposed procurement method, the alleged retaliation appellant suffered, and the health repercussions that appellant experienced.

During his job search, appellant asked O'Brien to serve as a reference. O'Brien agreed and provided a recommendation to the University of Northern Florida. Following her discussion with the University

---

4. Prior to the Crookston project conflict, Perkins had never expressed dissatisfaction with appellant's work. The university never questioned or criticized appellant's work performance. Saundra Martell, Associate General Counsel, testified that appellant's project management and delivery responsibilities were removed by Perkins because appellant "was not considered to be a team player." Martell further testified that she believed appellant's contract was later not renewed by Perkins for the same reason. Appellant alleges that Perkins's statements regarding appellant's failure to cooperate with the team revolves solely around his report of illegal behavior concerning the Crookston project.

5. Prior to appellant's February 23, 2004 meeting with Martell, he had already expressed these concerns to her.

6. Klatt initiated an investigation within her department and a report was drafted. Some of appellant's concerns were validated, while others remained unconfirmed.

7. Conflicting stories exist on whether or not appellant completed the assigned tasks by the April 5, 2004 deadline. Appellant testified that one task required information from Perkins which he did not provide until the deadline had passed. Appellant testified that the second task was completed while he was recovering from surgery and the third by the deadline. Conversely, respondents claim that appellant failed to complete the tasks on time and to provide any e-mail updates.

of Northern Florida, O'Brien left appellant a voice mail summarizing the conversation:

Hi, Jack, this is Kathy O'Brien calling. Um, I'm just calling cause I wanted you to know that I had a call from Lance Taylor at the University of North Florida on Friday, ah, July 2, and I had a lengthy conversation with him, and I believe a couple other members of the search committee tried to give you a good grades and a sound recommendation for the position there. And also, I wanted you to know that when they asked why, ah, you left the University, I told them that there was a major change in the organization and that you and others had, um, a conflict with our new director and that that's why you moved on. And they asked if others had been unappointed or left at the same time you did, and I said yes. So it sounded from the question and the way I answered it like I had responded to their concerns. And did just want you to know that I touched that base immediately when they called me on Friday. And so good luck in that search, and if you have other places you're applying and you expect me to get a call, please let Gayle know and I'll try to respond to them promptly. Hope you had a good Fourth of July and that your knees are doing good. Ah, bye now.

O'Brien testified that she informed the University of Northern Florida that appellant left due to a difference of professional opinion. O'Brien told Florida not to be concerned because the differences were "honest and professional differences." In response to Florida's question of whether O'Brien would hire appellant, O'Brien testified that she responded favorably by saying she would. Florida did not hire appellant but appellant does not know why. Appellant ceased using O'Brien as a reference.

Appellant sued the university and Perkins, claiming protection under Minnesota's whistleblower statute, and alleging tortious conduct. On April 20, 2006, the district court granted respondents' motion for summary judgment. The order granted summary judgment to respondents on appellant's common law-claims on the ground of lack of subject matter jurisdiction. The order granted summary judgment to respondents on appellant's whistleblower claims on the ground that appellant could not establish a prima facie case. Judgment was then entered and this appeal followed.

## ISSUES

I. Did the district court err by granting summary judgment with respect to appellant's whistleblower claims?

II. Did the district court err by granting summary judgment with respect to appellant's tort claims?

III. Did the district court err by requiring appellant to return certain documents to respondents?

## ANALYSIS

On appeal from summary judgment, this court must decide if there are any genuine issues of material fact and if the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). The evidence in the record must be reviewed in the light most favorable to the party against whom summary judgment was granted. *Hedglin v. City of Willmar*, 582 N.W.2d 897, 901 (Minn.1998). Summary judgment must be granted against a party who fails to establish an essential element of a claim, if the burden of proof rests with that party, because a failure to establish an essential element renders all other facts immaterial. *Bersch v. Rgnonti & Assocs., Inc.*, 584 N.W.2d 783, 786 (Minn.App.1998), *review denied*

(Minn. Dec. 15, 1998). When deciding a purely legal issue, the reviewing court need not defer to the district court's decision. *Frost–Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

## I. Whistleblower Claims

Under Minnesota's whistleblower statute, "[a]n employer shall not discharge ... an employee ... because: (a) the employee ... in good faith, reports a violation or suspected violation of any federal or state law or rule ... to an employer or ... governmental body or law enforcement official...." Minn.Stat. § 181.932, subd. 1(a) (2006). Additionally, an employer is prohibited from discharging an employee because "(c) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule ... and the employee informs the employer that the order is being refused for that reason...." Minn.Stat. § 181.932, subd. 1(c) (2006).

■ In Minnesota, whistleblower claims are analyzed by applying the *McDonnell Douglas* burden-shifting test. *Cokley v. City of Otsego,* 623 N.W.2d 625, 630 (Minn.App.2001), *review denied* (Minn. May 15, 2001). First, a plaintiff must establish a prima facie case of retaliatory action. *Id.* (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). Then the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for its action. *Id.* Finally, the employee may demonstrate that the employer's articulated reason is pretextual. *Id.* The employee bears the overall burden of persuasion. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 445–46 (Minn. 1983).

■ The district court found, in response to appellant's claims under both subdivisions 1(a) and 1(c) of section 181.932, that appellant failed to "show that he engaged in any statutorily-protected conduct" and therefore, failed to establish a prima facie case. Appellant disagrees and argues that the district court erred in concluding that appellant failed to make a prima facie showing of retaliatory discharge. "A prima facie case of retaliatory discharge ... requires the employee to demonstrate statutorily protected conduct by the employee, an adverse employment action by the employer, and a casual connection between the two." *Gee v. Minn. State Coll. and Univ.,* 700 N.W.2d 548, 555 (Minn.App.2005). Appellant appears to argue that sufficient evidence exists to permit a trier of fact to find that he engaged in a protected activity. We disagree.

■ To engage in a protected activity an employee must make a good-faith report that implicates a violation or suspected violation of federal or state law or rule adopted pursuant to law. *Obst v. Microtron, Inc.,* 614 N.W.2d 196, 200 (Minn. 2000). An actual violation of law is not necessary, but "the reported conduct must at least implicate a violation of law." *Id.* A specific rule or law need not be named if the alleged facts, *if proven, would constitute a violation* of a law or rule adopted pursuant to law. *Abraham v. County of Hennepin,* 639 N.W.2d 342, 354–55 (Minn. 2002).

*Subdivision 1(a)*

■ Under subdivision 1(a), appellant alleges that he made two reports of illegal activity, that of: (1) Perkins's proposed illegal procurement method; and (2) fiscal irregularities to the audit department. The district court found that "[appellant] cannot establish a prima facie case under subdivision 1(a) because he cannot show

that he engaged in any statutorily protected conduct." Further, the court stated that "even if [appellant's] allegations are true, there is no violation of law as required by subdivision 1(a)." We agree.

It is undisputed that the university did not proceed with the procurement method suggested by Perkins. In fact, no low bidder existed at the time with whom respondents could have negotiated because the one bid received had already been rejected. The mere suggestion of improper conduct, which the university refrained from following, did not amount to statutorily protected conduct.[8] *See Borgersen v. Cardiovascular Systems, Inc.,* 729 N.W.2d 619, 624, 2007 WL 968867, at *4 (Minn. App. Apr.3, 2007) (holding that appellant made a report to his employer, but it was not a report suspecting his employer of a violation or an attempted violation of federal or state law; he merely expressed safety concerns). The facts asserted by appellant, that Perkins "proposed" using an improper procurement method but did not, if proven, do not constitute a violation of law. *See Abraham,* 639 N.W.2d at 355 (stating that an employee must "allege[ ] facts that, if proven, would constitute a violation of law or rule").

The district court relied on *Petroskey v. Lommen, Nelson, Cole & Stageberg, P.A.* in its summary judgment decision. 847 F.Supp. 1437 (D.Minn.1994). *Petroskey,* a 1994 United States District Court case applying Minnesota's whistleblower statute, found that subdivision 1(a) does not apply where an employee alleges that the employer contemplated but refrained from unlawful conduct. 847 F.Supp. at 1447–48 ("The mere fact that, theoretically, an employer may contemplate action which, if consummated, could be contrary to public policy is insufficient, under the governing law, to invoke the protections of the Whistleblower Statute."). *Petroskey* further noted that "the statutory language [of section 181.932] speaks to conduct which has already transpired, and the fact that an avenue of action has been contemplated by the employer and rejected insulates that conduct from the whistleblower proscriptions." 847 F.Supp. at 1448 citing *Michaelson v. Minnesota Mining & Mfg. Co.,* 474 N.W.2d 174, 180 (Minn.App.1991), *aff'd mem.,* 479 N.W.2d 58 (Minn.1992). In *Michaelson,* an employee's claim failed, in part, because he did not report conduct, but instead, provided legal analysis to his supervisor on proposed business decisions. *Michaelson,* 474 N.W.2d at 180.

This case is analogous to *Petroskey* and *Michaelson.* Appellant alleges that Perkins engaged in illegal conduct, which he reported. Appellant's allegations, however, do not amount to a violation of law by Perkins or the university. Perkins contemplated a course of action, which would have been illegal if pursued, but he refrained from following through with his proposed actions.

Appellant was his advisor, and his advice was taken by respondents. It was appellant's job, based on his position and his responsibility as the individual authorized with first-level of sign-off to proceed with projects to ensure that the university did not engage in improper procurement methods. *See Gee,* 700 N.W.2d at 556 (holding that the plaintiff did not have a whistleblower claim when her stated purpose in reporting was to fulfill her responsibilities as a faculty advisor). There were individuals specifically in charge of procurement methods at the university, but appellant testified that as the party re-

---

8. Respondents conceded in their summary judgment brief to the district court that "[t]he University, for purposes of this summary judgment motion, does not dispute that it would be a violation of law for it to solicit bids and then negotiate with the low bidder."

sponsible for first-level authorization, he received and reviewed all documents, including documents pertaining to procurement methods, before granting approval to proceed with projects.

### Subdivision 1(c)

Appellant argues that under subdivision 1(c), he refused to take an illegal action. The district court stated that "there is no evidence to support a finding that Denny or the University ever ordered [appellant] to *perform an action* that he believed to be unlawful," and therefore, appellant failed to establish a prima facie case because he could not show that he engaged in statutorily protected conduct. We agree.

Appellant was the director of design and construction and was the first level of sign-off on all orders to proceed on projects. Appellant testified that his sign-off was the "culmination of the procurement process . . . and authorizes appropriate representatives . . . to execute a contract to proceed with the project." Appellant had authorization up to $250,000 for orders to proceed, while higher management approval was required for projects of greater amounts.

■ The statute does not require that an employer explicitly or blatantly order the employee to violate the law. *See* Minn. Stat. § 181.932, subd. 1(c). Indirect or implied directions could constitute an adequate order. *Cf. Piekarski v. Home Owners Sav. Bank, F.S.B.,* 956 F.2d 1484, 1491–92 (8th Cir.1992) (holding that a "stern look" is not a demand to break the law, but not precluding the possibility that an implied request to break the law could constitute a violation of an earlier version of Minn.Stat. § 181.932, subd. 1(c)). Because illegal conduct is often shielded, implied directives conveying to an employee a request to violate the law warrant protection under subdivision 1(c).

■ Appellant believed the university, through Denny, directed him to engage in illegal conduct with respect to the Crookston project. Appellant believed that Denny directed him to engage in illegal conduct based on a meeting that appellant had with Denny where Denny informed appellant about the plan to negotiate with the low bidder to get the project within budget. It is undisputed that Denny never asked appellant to sign off on the potential procurement method and never presented documents to appellant for his signature. Instead, appellant testified that because of his position and responsibilities as director of design and construction, including first level of sign-off, that he was requested to engage in an illegal activity as a result of his conversation with Denny.

No one at the university ordered appellant to violate the law. There is no evidence of pressure or directives requiring appellant to violate the law. Appellant's belief results only from a conversation with Denny early on in the university's process of starting a project. The university received an over-budget bid and at that point was merely discussing subsequent courses of action to effectuate the project. No negotiations with the low bidder had yet occurred and no documents requiring appellant's signature had yet been prepared.

We agree with the district court that appellant failed to establish a prima facie case because appellant did not engage in statutorily protected conduct. Appellant goes on to argue the remaining elements needed to establish a prima facie case of retaliatory discharge. We need not address these arguments because the first requirement, that of statutorily protected conduct, is not satisfied.

■ Even if we were to address these arguments, appellant's claim still fails.

The record indicates that well before appellant's illegal procurement allegation, the university was considering and taking steps towards a reorganization of its design and construction functions. The record is replete with documentation and discussions of eliminating appellant's position as well as other positions. Although the timing of appellant's termination and his allegation of improper conduct are unfortunate, and led to appellant's lawsuit, the record indicates his termination had been discussed beforehand and was a foregone conclusion.

## II. Tort claims

■ Whether a court has subject matter jurisdiction is a question of law and is reviewed de novo. *Burkstrand v. Burkstrand*, 632 N.W.2d 206, 209 (Minn. 2001). Absent an adequate method of review or legal remedy, judicial review of a quasi-judicial decision of an administrative body is available only by writ of certiorari. *Dietz v. Dodge County*, 487 N.W.2d 237, 239 (Minn.1992). Characterization of a claim in a complaint does not change the jurisdictional analysis:

> Regardless that the claim is cloaked in the mantle of breach of contract, when the alleged breach of the employment contract of a governmental employee results in termination of the claimant's employment by an executive body which does not have statewide jurisdiction ... the claimant may contest the employer's action by certiorari alone, absent statutory authority for a different process.

*Willis v. County of Sherburne*, 555 N.W.2d 277, 282 (Minn.1996). Absent statutory

pronouncement of an alternative process, "the dispositive question is whether the claim implicates an executive body's decision to terminate an employee." *Lueth v. City of Glencoe*, 639 N.W.2d 613, 617 (Minn.App.2002), *review denied* (Minn. Apr. 16, 2002).

■ The pertinent question becomes whether the claim is "separate and distinct from the termination of [ ] employment" or whether the claim arises out of a common nucleus of operative facts. *Willis*, 555 N.W.2d at 282. Of equal importance is whether the court's necessary inquiry into the facts surrounding a party's tort claims involves inquiring into the discretionary decision to terminate the individual. *Id.*

Appellant argues that the district court erred in granting summary judgment due to lack of subject matter jurisdiction on his tort claims of defamation and intentional interference with a business advantage.[9] The district court refused to exercise jurisdiction because the claims "necessarily entail[ ] inquiry into the University's decision to terminate [appellant]."

■ First, appellant argues that the district court had jurisdiction over his defamation claim. Appellant contends that the defamation was a post-termination event and not connected to any "quasi-judicial" process or his termination. He claims that respondents' agent, "in an effort to discredit [appellant] and cover up their own mistakes," made false statements about him.

In *Willis*, the court held that the terminated employee's defamation claim did not

---

9. For unknown reasons, in his brief appellant argues that the district court had jurisdiction over his whistleblower claim. He correctly states that a whistleblower claim is statutory and that the exclusive remedy by certiorari appeal is not applicable to his whistleblower claim. Subsequently, appellant acknowledges

that "[i]n fact, the trial court did not grant [respondents'] motion on this basis for the whistleblower count." Respondents concede the court's jurisdiction over appellant's whistleblower claim, acknowledging that they have "never argued otherwise."

involve any inquiry into the county board's discretionary termination decision. 555 N.W.2d at 282. The defamation alleged began more than a year before the employee's discharge, continued for a period of time, and was separate and distinct from the termination. *Id.*

Here, the alleged defamation occurred immediately following appellant's termination. The alleged defamatory comments were made by O'Brien and pertained to the reasons for the non-renewal of appellant's contract. O'Brien stated that appellant left because "there was a major change in the organization and that [appellant] and others had, um, a conflict with our new director and [ ] that's why [he] moved on."

The district court stated that "[l]itigation of this claim necessarily entails inquiry into the University's decision to terminate [appellant] because it would require an examination of whether there was conflict between [appellant] and Perkins and whether such conflict was the reason for [appellant's] termination." We agree. To determine if O'Brien's statement was false, the reasons for appellant's termination must be determined. Because the statements at issue here directly pertain to the reason for appellant's termination, an inquiry into the facts surrounding appellant's claim would require reviewing the university's discretionary decision to terminate appellant.

 Second, appellant argues that the district court had jurisdiction over his claim of intentional interference with a prospective economic advantage. Specifically, appellant claims that Perkins "fired [appellant] for his own reasons in an effort to hide or facilitate his illegal practices or to punish [appellant] for opposing them." In his short discussion of this issue, appellant recognizes that the reasons for his termination are directly applicable. As appellant acknowledges, although not explicitly, addressing the facts surrounding this claim necessitate inquiring into the university's discretionary decision to terminate appellant.

Appellant asserted this tort claim solely against Perkins. "A quasi-judicial decision need not be made by a commission or a board; one 'public officer' can make it. So, the fact that only one person at the University was ultimately responsible for making the promotion decisions does not disqualify the decisions as quasi-judicial acts." *Maye v. Univ. of Minn.*, 615 N.W.2d 383, 386 (Minn.App.2000) (citations omitted).

Respondents assert that Perkins was the university's decision-maker with respect to the renewal of appellant's contract. Perkins acted within his authority and capacity as a university employee. Appellant's claim does not affect anything that Perkins did as a private individual or in a private capacity.

Because both of appellant's tort claims require scrutinizing the university's decision to terminate appellant, the district court was correct in refusing to exercise subject matter jurisdiction.

### III. Return of documents

Appellant argues that the district court erred when it ordered the return of documents to respondents on the basis of attorney-client privilege. Neither party specifically identifies or discusses with any amount of detail the documents ordered to be returned by the district court. Appellant claims that the documents were normal business documents, including the university's bidding process rules and an architect's reports regarding technical issues of construction error. Appellant claims that the university distributed these documents to appellant and others during the normal course of business. Al-

ternatively, respondents claim that appellant, without authorization, took confidential documents when he left the university. Respondents claim that three of the documents were from university counsel to CPPM administrators, analyzing the application of law to specific facts and providing legal advice. The fourth document, respondents claim, contained breach of contract claims and damage amounts to be asserted by the university against an architect.

The district court found that the documents were protected by the attorney-client privilege and the work-product doctrine and issued a ruling from the bench requiring appellant to return the documents to respondents. Appellant did not order a transcript for review in this case. Therefore, there are no findings to review and the only conclusion of law from the district court is that which is stated by the parties in their briefs.

As a general rule, appellant bears the burden of providing an adequate record. *Mesenbourg v. Mesenbourg*, 538 N.W.2d 489, 494 (Minn.App.1995). The record must be "sufficient to show the alleged errors and all matters necessary for consideration of the questions presented." *Truesdale v. Friedman*, 267 Minn.

402, 404, 127 N.W.2d 277, 279 (1964). If the record is not sufficient to support review, the appeal may be dismissed. *Noltimier v. Noltimier*, 280 Minn. 28, 29, 157 N.W.2d 530, 531 (1968). Since the record lacks a transcript, which contains both the court's findings and its conclusion, this issue cannot be properly reviewed, and appellant's claim on this issue is dismissed.

## DECISION

Appellant did not engage in any statutorily-protected conduct. He gave his advice to respondents, the advice was eventually accepted, and no illegal activity ever started. Appellant was never ordered or pressured to do anything illegal.

The district court did not err in granting the university's summary judgment motion.

The district court properly ordered the return of certain documents to respondents.

**Affirmed.**