Kathryn BRENNY, Respondent,

v.

The BOARD OF REGENTS OF the UNIVERSITY OF MINNESOTA, Defendant,

John Harris, individually and in his capacity as Director of Golf, Appellant.

No. A11–1339.

Court of Appeals of Minnesota.

May 7, 2012.

Donald Chance Mark, Jr., Shannon M. McDonough, Peter A.T. Carlson, Fafinski Mark & Johnson, P.A., Eden Prairie, MN, for respondent.

Richard T. Ostlund, Randy G. Gullickson, Anthony Ostlund Baer & Louwagie, P.A., Minneapolis, MN, for appellant.

Considered and decided by CONNOLLY, Presiding Judge; WORKE, Judge; and STAUBER, Judge.

## OPINION

WORKE, Judge.

The district court denied a motion, brought by appellant, the director of golf at the University of Minnesota, to dismiss the tortious-interference-with-contract claim asserted by respondent, the former associate head coach of women's golf at the university. The action was premised on the university's decision not to renew respondent's employment contract and to reassign her. She alleged that appellant's actions were motivated by bigotry and constituted constructive discharge. Appellant challenges the district court's decision, arguing that the court lacked subject-matter jurisdiction to hear the claim because it involved a discretionary decision by the university reviewable only by petition for writ of certiorari to this court. We agree and reverse.

## FACTS

Because we are reviewing the district court's denial of dismissal on the plead-

ings, we accept as true the facts as alleged in respondent Kathryn Brenny's amended complaint. In July 2010, appellant John Harris, the newly hired director of golf at the university, contacted respondent to ask whether she was interested in the position of associate head coach for the women's golf team. The job description listed key duties as assisting in (1) "selection, supervision, and coaching of the team[;]" (2) "identification, and recruitment of qualified student-athletes[;]" (3) "development and execution of" season plans, "including tournament schedules, practice schedules and conditioning programs[;]" (4) "overseeing and monitoring" student-athletes' academic performances; and (5) "special events and tournaments[and] planning and conducting clinics, camps, seminars, and outreach to public service." The job description also required the associate head coach to establish and maintain relationships with important groups within and outside of the university and to demonstrate a commitment to following pertinent rules and regulations.

During August 2010, appellant met with respondent, and she applied and interviewed for the job. In one of their discussions, appellant disclosed that he could not hire his son-in-law, Ernie Rose, for the coaching position because Rose did not have a college degree. Appellant did hire Rose as director of golf instruction, however. This position did not require a college degree. Appellant offered respondent the coaching position, and she agreed to a 12–month contract with a base salary of $44,000. The contract permitted the university to "non-renew [respondent's] appointment and reassign [respondent] to other or no duties without just cause."

Appellant also hired John Carlson to serve as associate head coach for the men's golf team. Carlson's qualifications and experience were similar to respondent's, and Carlson's job description was identical to respondent's.

Respondent alleged in the amended complaint that appellant is homophobic: that appellant did not want to hire a homosexual to coach the women's golf team, and that when he learned of respondent's sexual orientation, he refused to allow her to perform her job, beginning at the start of her employment on September 1, 2010. Appellant allegedly prohibited respondent from traveling with the women's team, delegated administrative tasks to her, blocked her from meeting with the team, limited her e-mail contact with the team, prohibited her from providing golf instruction to the team, and told her that Rose was to serve as the team's instructor. In denying her the ability to schedule team meetings, appellant allegedly said, "You have nothing to talk to these girls about[,]" and when she asked what she could talk to the team about, he replied, "[B]oys, life, and school[.]"

Respondent complained to the senior and associate athletic directors, Elizabeth Eull and David Crum, about appellant's conduct, and on September 17, 2010, she attended a meeting with both athletic directors and appellant. During the meeting, appellant told her that she would receive a new job description and that she had the weekend to decide if she was "on board" with appellant's program. The new job description significantly curtailed respondent's duties, limiting her authority, giving her less contact with the team, and increasing her administrative duties.

According to respondent, appellant's mistreatment of her continued. She was excluded from a team event and dinner at appellant's home, and appellant referred recruits to Rose for any questions about the women's team, told several players that respondent's hiring was "the worst decision that the [u]niversity's golf pro-

gram [ ] ever made," and told players that respondent did not travel with the team because appellant "discovered she was a homosexual and did not want her on the road with the team."

During October 2010, respondent met twice with head athletic director Joel Maturi, and contacted the human resources department about initiating a grievance. At the end of the month, the university offered respondent a sales position at TCF Bank Stadium, a position not affiliated with the golf program. The university also offered her a severance package, which respondent initially accepted but then later rescinded. Next, the university informed respondent that it decided to not renew her employment contract and to reassign her to the sales position. She rejected the offered sales position because she concluded that she had been constructively discharged.

In January 2011, respondent initiated a civil action against defendant The Board of Regents of the University of Minnesota (board) and appellant, suing appellant both individually and in his capacity as director of golf at the university. Respondent asserted three counts against only the board, alleging violations of the Minnesota Human Rights Act, Minn.Stat. §§ 363A.01–.43 (2010); one count against both the board and appellant, alleging false statements as inducement to entering employment, a violation of Minn.Stat. § 181.64 (2010); and one count against only appellant, alleging tortious interference with contract.

Appellant moved to dismiss under Minn. R. Civ. P. 12.02(a), asserting that the district court lacked subject-matter jurisdiction over respondent's tortious-interference claim because the exclusive method for challenging the university's actions involving respondent's employment was by petition for writ of certiorari to this court.

The board and appellant also moved to dismiss respondent's statutory fraud claims under section 181.64. The district court dismissed respondent's section 181.64 claims but denied appellant's motion to dismiss the tortious-interference claim. Respondent's other statutory claims of discrimination against the board remain intact and are still pending before the district court. The board takes no part in this appeal.

## ISSUE

Did the district court err by exercising subject-matter jurisdiction to decide respondent's tortious-interference-with-contract claim?

## ANALYSIS

A party may move to dismiss a claim, among other reasons, if the district court lacks subject-matter jurisdiction. Minn. R. Civ. P. 12.02(a). In ruling on a motion to dismiss, the district court must accept all facts alleged in the complaint as true and construe all reasonable inferences in favor of the non-moving party. *In re Individual 35W Bridge Litig.*, 806 N.W.2d 820, 826–27 (Minn.2011). Dismissal is permitted under rule 12.02, "only if it appears to a certainty that no facts, which could be introduced consistent with the pleading, exist which would support granting the relief demanded." *Bahr v. Capella Univ.*, 788 N.W.2d 76, 80 (Minn.2010) (quotation omitted). This court reviews de novo a district court's decision on a motion to dismiss, because it involves a question of law. *Grundtner v. Univ. of Minn.*, 730 N.W.2d 323, 332 (Minn.App.2007) (stating that whether a court has subject-matter jurisdiction is a question of law reviewed de novo).

The University of Minnesota is a legal entity within the State of Minnesota. The university has "autonomous status" as

a "constitutional corporation." *Bailey v. Univ. of Minn.,* 290 Minn. 359, 360, 187 N.W.2d 702, 704 (1971). In recognition of that status, courts of this state must accord the university substantial deference; the university's "governing body, the Board of Regents, is generally free of ... judicial interference as long as it properly executes its duties." *Bd. of Regents of Univ. of Minn. v. Reid,* 522 N.W.2d 344, 346 (Minn.App.1994), *review denied* (Minn. Oct. 27, 1994). This autonomy is derived from the principle of separation of powers. *Maye v. Univ. of Minn.,* 615 N.W.2d 383, 385 (Minn.App.2000). Consistent with the deference accorded the university, generally, "the only method available for [judicial] review of a university decision" is by writ of certiorari to this court. *Shaw v. Bd. of Regents,* 594 N.W.2d 187, 191 (Minn.App. 1999), *review denied* (Minn. July 28, 1999); *see Williams v. Bd. of Regents,* 763 N.W.2d 646, 651 (Minn.App.2009) (stating "[i]ssuance of a writ of certiorari by the court of appeals pursuant to Minn.Stat. § 606.01 [2010] is the only method available for review of a university [employment termination] decision").

■ When analyzing a tort claim against the university, such as the tortious-interference claim at issue here, unless a statute calls for a "different process, the dispositive question is whether the claim implicates an executive body's decision to terminate [1] an employee." *Id.* (quotation omitted); *see Dietz v. Dodge Cnty.,* 487 N.W.2d 237, 239 (Minn.1992) (noting that county nursing home administrator was required to appeal her termination decision by writ of certiorari because no statute permitted a right of appeal of an administrative decision by a county administrative body). In *Willis v. Cnty. of Sherburne,* 555 N.W.2d 277, 280

(Minn.1996), the supreme court summarily rejected a plaintiff's recasting of a wrongful-discharge complaint as a "pure" breach-of-contract claim in order to avoid the exclusivity of certiorari review. More recently, citing *Willis,* this court stated that "[t]he characterization of a claim in a complaint does not change the jurisdictional analysis." *Williams,* 763 N.W.2d at 651; *Grundtner,* 730 N.W.2d at 332 (Minn.App.2007) (same). The crux of the jurisdictional analysis depends on "whether the claim is separate and distinct from the termination of [ ] employment or whether the claim arises out of a common nucleus of operative facts." *Williams,* 763 N.W.2d at 651 (quotation omitted); *Grundtner,* 730 N.W.2d at 332.

A review of pertinent caselaw compels our conclusion that respondent's claim was subject to only certiorari review because it is so intertwined with the university's employment decision-making process. Several cases weighed analogous facts in determining whether a court had subject-matter jurisdiction to hear contract- and tort-based claims of similarly-situated employees. In *Willis,* the supreme court ruled that a discharged county employee's right of appeal to raise a breach-of-contract claim premised on the employer's failure to follow procedures set forth in an employee handbook was solely by petition for writ of certiorari. 555 N.W.2d at 282. The *Willis* court ruled that the district court had jurisdiction over a defamation claim made by the employee because that tort was "separate and distinct from the termination of [ ] employment." *Id.*

In *Williams,* this court considered the appropriate review vehicle for an individual who had been offered employment as an assistant basketball coach but later was

---

1. Respondent's claim is akin to a termination decision because she alleges that appellant's

wrongful conduct resulted in her constructive discharge from employment.

denied the position by the head athletic director. 763 N.W.2d at 650. As to the putative employee's promissory- and equitable-estoppel claims, we held that those claims could be reviewed only by writ of certiorari because they necessitated consideration of the university's internal hiring procedures, an offer of employment, and a decision not to employ the individual, all of which involved discretionary university decisions. *Id.* at 652. However, the *Williams* court permitted the putative employee to bring a negligent-misrepresentation claim because it concluded that consideration of that claim did not "intrude substantially on or challenge the university's decision-making process" and because "the actual hiring decision [was] not at issue and [was] not directly implicated" by that claim. *Id.* at 652–53.

And in *Grundtner,* this court determined that the district court lacked subject-matter jurisdiction over a discharged university employee's tort claims of defamation and intentional interference with a business advantage because determination of those claims necessarily "require[d] scrutinizing the university's decision to terminate[.]" 730 N.W.2d at 333.

■ As in *Willis, Williams,* and *Grundtner,* we conclude that respondent's tortious-interference-with-contract claim is inextricably linked to the university's decision to not renew her employment contract and to alter her job duties, which are discretionary decisions. According to respondent, her problems began on the first day of her employment and continued for approximately the next two months, culminating when she concluded that she was constructively discharged. During this period, respondent initiated and attended numerous meetings with appellant and other university supervisory employees, who responded to her complaints by first warning her to "get on board" with appellant's leadership of the women's golf program, and eventually by reassigning her to a position outside of the golf program. The decisions of respondent's superiors, including appellant, were made within the scope of their employment. As such, delving into the underlying motivations for appellant's conduct would impermissibly inquire into the university's exercise of discretion to hire, manage, or dismiss its employees. *See Williams,* 763 N.W.2d at 652 (refusing to exercise subject-matter jurisdiction on estoppel claim that "would require not just consideration of the university's internal hiring procedure and the details of an alleged offer of employment but also appellant's equitable rights to employment and the university's ultimate decision not to employ appellant"); *Grundtner,* 730 N.W.2d at 333 (refusing to exercise subject-matter jurisdiction when allegedly defamatory statements made to a dismissed university employee would necessitate a review of the facts supporting dismissal of the employee, a discretionary decision).

Respondent asserts that appellant's interference with her employment contract was "motivated by malice and bad faith," which "took him outside the scope of" his employment, rendering him personally liable. *See Nordling v. N. States Power Co.,* 478 N.W.2d 498, 506–07 (Minn.1991). We disagree. All of appellant's alleged actions were taken in his capacity as director of golf at the university. *See Grundtner,* 730 N.W.2d at 333 (rejecting claim that supervisor acted outside the scope of employment when all of supervisor's conduct was "within his authority and capacity as a university employee"). Moreover, as *Grundtner* makes clear, allegations of bad-faith motivation (in that case, to hide or facilitate the supervisor's illegal practices or punish the employee for opposing them) were directly related to the university's decision to discharge the employee, which

compelled application of the certiorari rule. *See* 730 N.W.2d at 333. The court never held that bad faith was an exception to the certiorari rule. Respondent alleged no conduct on the part of appellant that was outside the scope of his employment. Under these circumstances, none of appellant's conduct can be culled from his employment-based decisions, which are not subject to review in a civil action initiated in district court. *See id.* (rejecting tortious-interference claim based on a supervisor's conduct toward subordinate employee when employee's allegations did not include conduct by supervisor "as a private individual or in a private capacity").

## DECISION

We conclude that respondent could seek review of appellant's actions only by petitioning for writ of certiorari, and she did not do so. The district court, therefore, erred by denying appellant's motion to dismiss that claim.

**Reversed.**

STAUBER, Judge, (dissenting).

I respectfully dissent and would affirm the district court's decision. In order to maintain a prima facie claim of tortious interference with contract, Ms. Brenny was required to show "(1) the existence of a contract, (2) that defendant knew of the contract, (3) that defendant intentionally procured a breach of the contract without justification, and (4) that plaintiff suffered injuries as a direct result of the breach." *Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 559 (Minn.App.2001). It is true that an employee may interfere with or cause a breach of another employee's contract, but that privilege ends if the employee who procured the breach did so because of "malice and bad faith," which includes "personal ill-will, spite, hostility, or a delib-erate intent to harm the plaintiff employee." *Nordling v. N. States Power Co.,* 478 N.W.2d 498, 507 (Minn.1991).

What is malice? It is "[t]he intent, without justification or excuse, to commit a wrongful act ... [r]eckless disregard of the law or of a person's legal rights ... [i]ll will; wickedness of heart." *Black's Law Dictionary* 1042 (9th ed.2009). According to Ms. Brenny, from the moment Mr. Harris learned of her sexual orientation, he effectively and completely blocked her from performing her job, for which she was well-qualified, and unilaterally revoked nearly all of her contracted job duties as head coach of the women's golf team. Mr. Harris allegedly stated that he would not permit Ms. Brenny to travel with the team to tournaments because he "discovered [that] she was a homosexual and did not want her on the road with the team." Thus, if she can prove her allegations, Mr. Harris' conduct was wholly unrelated to the university's management or supervision of Ms. Brenny as an employee; instead, it was a personal attack based on nothing but his own bigotry. Indeed, Mr. Harris' decision was made before Ms. Brenny had a chance to perform any of her job duties. As such, Mr. Harris' conduct was "separate and distinct" from the university's employment decision and is not subject to the same limited certiorari review. *See Willis v. Cnty. of Sherburne,* 555 N.W.2d 277, 282 (Minn.1996) (separating county employee's defamation claim from other employment-related claims in holding that county employee's defamation claim was not subject to certiorari review); *Williams v. Bd. of Regents of the Univ. of Minn.,* 763 N.W.2d 646, 652 (Minn.App. 2009), *review granted* (separating employee's negligent misrepresentation claim from other claims that were linked to the university's employment-related decisions, for purposes of determining whether the

district court retained subject-matter jurisdiction).

Ms. Brenny has clearly alleged a prima facie case of malicious tortious interference of contract against appellant Harris, and that claim is not limited to certiorari review for purposes of determining subject-matter jurisdiction. Because of this, dismissal of her claim of tortious interference is, as the district court noted, premature. As the district court stated, "Mr. Harris repeatedly attempts to argue the facts presented and asks the Court to weigh his factual assertions against Ms. Brenny's. Such weighing of fact and credibility is not appropriate on a Rule 12 Motion to Dismiss."

At this stage, we must assume that all of the allegations of the complaint are true and draw all inferences in favor of Ms. Brenny. *Williams,* 763 N.W.2d at 651. Ms. Brenny pleaded a prima facie case of both interference and malice; she should be allowed to present her case.