*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2218**

Nancy Salscheider,
Appellant,

vs.

Allina Health System d/b/a Allina Hospitals & Clinics,
Respondent.

**Filed July 7, 2014
Affirmed
Rodenberg, Judge**

Hennepin County District Court
File No. 27-CV-12-25088

Tammy Provo Friederichs, Stephen M. Thompson, Friederichs & Thompson, P.A., Bloomington, Minnesota (for appellant)

Amy C. Taber, Tina Syring-Patrocchl, Barnes & Thornburg, LLP, Minneapolis, Minnesota (for respondent)

Considered and decided by Johnson, Presiding Judge; Rodenberg, Judge; and Hooten, Judge.

## U N P U B L I S H E D   O P I N I O N

**RODENBERG**, Judge

Appellant Nancy Salscheider challenges the district court's grant of summary judgment in favor of respondent Allina Health System dismissing appellant's whistleblower suit. We affirm.

**FACTS**

Appellant worked for respondent as a triage nurse answering phone calls from hospice patients and their family members.  In late 2010 or early 2011, the triage nurses also began receiving calls from patients and families involved in Senior Care Transitions (SCT).[1]  On the first night that the triage nurses began taking calls from SCT, appellant received a binder containing SCT's protocols and policies.  That same night, appellant received a call from an SCT facility, requesting authorization to release a body.  Appellant consulted the SCT policy manual and saw that it purported to authorize her to release the body of a deceased patient to a mortuary.  But appellant knew that it is illegal for nurses to release bodies.[2]

Appellant reported the illegality of this policy to her supervisor, Todd Wahlstrom.  According to Wahlstrom, he brought the issue to the attention of his supervisors and told the triage nurses not to follow the illegal protocol.  One of the triage nurses crossed out the language in the SCT manual and wrote in alternative directions.  At some point, the language in the policy authorizing the release of a patient's body was crossed out by a

---

[1] SCT is an Allina program serving patients in long-term care facilities.

[2] In her brief, appellant refers to the policy as "illegal."  Respondent notes that it checked with the Minnesota Board of Nursing regarding the legality of the policy and then changed it.  As the district court found, "[b]oth parties agree that the death protocol as originally written and included in the manual given to triage employees included an unlawful directive."  On appeal, the parties agree that this provision of the policy manual was improper under Minnesota law.

word-processing program. But, according to appellant, "no one ever followed up with me. I never heard from anyone about it and the policy remained in the binder."[3]

At some point before April 2011, appellant attended a routine triage meeting with Wahlstrom, other triage nurses, and Gayle Mattson, the president of Allina Home Community Services.[4] According to appellant, she mentioned at this meeting that the policy regarding the release of bodies was illegal. And Mattson "looked very, very unhappy that this was even being mentioned." Mattson stated in her deposition that she recalled feeling "embarrassed" because "there was an outside guest at the meeting," "an employee of another department or function of [respondent]." Mattson testified that she does not recall the substance of appellant's comments at the meeting.

In April 2011, Dawn Strief became appellant's supervisor. On June 13, Strief made a scheduling error about which appellant left Strief a voicemail message that Strief regarded as "angry" and "inappropriate." According to Strief, appellant stated, "I don't know how you could treat me like this. You'd better have your pager on because you'll be working a lot of extra shifts from now on." Strief corrected her scheduling error, but

---

[3] The district court found that "the policy was changed and the triage staff [were] informed that they were not authorized to release bodies." The record suggests that the nurses were told not to follow the illegal policy at some point before April 2011. But the record does not establish when the written policy was changed. An April 2012 email thread between the triage nurses reveals that the written policy may not have been changed until after April 2012. But the record is clear that the policy was verbally changed "early on" and respondent did not enforce the written policy. And appellant makes no claim that the illegal policy remains in effect.

[4] Appellant argues that the meeting occurred in late March or early April, while respondent argues that the meeting occurred in late January or early February. The record does not establish the exact date of the meeting. But because the parties generally agree on the order of events, the exact date of this meeting is not of dispositive importance.

3

emailed appellant on June 15 that she was "not entirely off the hook." Strief also stated, "I have since learned that this is a behavior pattern for you over the last several years. This type of behavior is not appropriate for a respectful workplace."

On June 17, Strief spoke to appellant regarding the "somewhat threatening nature of this voicemail." According to Strief, "I relayed my concerns about this behavior, since I had been told about several other incidents of this type of behavior in the past, including: leaving angry and inappropriate voicemails for other managers and speaking inappropriately to AHCS President, Gayle Mattson, at a routine triage meeting." Later that day, Strief contacted Wahlstrom, asking for details regarding appellant's comments at what she described as the "infamous triage meeting." Wahlstrom responded that appellant was "rude to a guest speaker" but that he could not "remember specifically what she said." In her deposition, Strief stated that Wahlstrom never told her that the discussion involved the release of bodies. Strief then contacted another person who attended the meeting to see whether she "remember[ed] specifically what [appellant] said that was rude." This other person responded that there was a visitor at the meeting from interpreter services and that Mattson "mentioned being embarrassed in front of him." But this person could not remember "who made which comments," although she concluded that appellant's "behavior was considered rude [and] unprofessional . . . , particularly in front of a guest."

In December 2011, Strief warned appellant in writing concerning three complaints from patient family members regarding appellant's phone demeanor and noted that appellant had failed to document these phone calls as required. The warning also

4

described complaints from appellant's coworkers and managers describing her as "belligerent," "aggressive . . . in meetings," "rude to others," and "unwelcoming to new staff." After appellant objected to the written warning, Strief revised its language. The revised warning described "multiple instances of poor communication" with families, staff, and coworkers, "multiple instances of inadequate documentation," one of which led to an investigation by the Minnesota Department of Health, and "periodic resistance to embracing changes in process and procedure."

Respondent continued to receive complaints about appellant from family members and coworkers. In June 2012, Strief prepared an updated report noting additional issues with appellant's behavior and her poor attendance at triage meetings. Routine audits of appellant's chart documentation also uncovered multiple missed entries from December through April. And the updated report stated that appellant "has high numbers of additional hours worked." Strief explained that overtime hours were "allowed in the past due to low staffing levels" but would be discontinued with the arrival of four newly trained nurses. During a meeting in June regarding this updated report, Strief asked her to make a decision regarding her employment status. Appellant applied for, and was granted, a medical leave of absence to address her work-related stress.

On January 15, 2013, appellant filed this action, alleging that respondent had violated the Minnesota Whistleblower Act (MWA), Minn. Stat. § 181.932 (2012). On February 19, 2013, respondent sent a letter notifying appellant that her leave of absence had been authorized through January 1, 2013, and that respondent had filled her position after appellant did not return to work. The letter explained that respondent would

5

consider appellant to have voluntarily resigned effective March 20 unless respondent heard from her. On March 20, appellant notified respondent that she had decided not to return to work and quit her position.

After discovery, respondent moved for summary judgment. The district court concluded that, although appellant had engaged in statutorily protected conduct under the MWA, she had failed to establish either that she faced an adverse action from respondent in response to her conduct or that there was a causal connection between the disciplinary actions and the protected conduct. The district court further concluded that, even if appellant had established a prima facie case of retaliation, she could not show that respondent's proffered reasons for its actions were pretextual. It therefore granted respondent's motion for summary judgment. This appeal followed.

## DECISION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. "On appeal, we review a grant of summary judgment to determine (1) if there are genuine issues of material fact and (2) if the district court erred in its application of the law." *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 371 (Minn. 2008) (quotation omitted). "We view the evidence in the light most favorable to the party against whom summary judgment was granted." *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002). But "the party resisting summary judgment must do more than rest on mere averments." *DLH,*

6

*Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997). No genuine issue of material fact exists "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.* at 69.

Under the MWA:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
> (1) the employee . . . in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer . . .; [or]
> (3) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law . . . , and the employee informs the employer that the order is being refused for that reason[.]

Minn. Stat. § 181.932, subd. 1(1), (3) (Supp. 2013).[5] Whistleblower claims are analyzed under the *McDonnell Douglas* burden-shifting test. *Grundtner v. Univ. of Minn.*, 730 N.W.2d 323, 329 (Minn. App. 2007); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 1824 (1973). Under this analysis, "[t]he employee bears the overall burden of persuasion." *Grundtner*, 730 N.W.2d at 329. The employee must first "establish a prima facie case of retaliatory action." *Id.* "A prima facie case of retaliatory discharge under the whistleblower statute requires the employee to

---

[5] Minn. Stat. § 181.932, subd. 1(1) was amended effective May 25, 2013 to protect an employee who reports a "planned violation" of law. 2013 Minn. Laws ch. 83, § 4. Because the statute became effective before the district court's order, which was filed on October 22, 2013, and because the amended language is not relevant to this appeal, we cite the most recent version of the statute. *See Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs*, 617 N.W.2d 566, 575 (Minn. 2000) (stating that, generally, "appellate courts apply the law as it exists at the time they rule on a case").

demonstrate statutorily protected conduct by the employee, an adverse employment action by the employer, and a causal connection between the two." *Gee v. Minn. State Colls. & Univs.*, 700 N.W.2d 548, 555 (Minn. App. 2005). If the employee establishes a prima facie case of retaliatory action, "the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for its action." *Grundtner*, 730 N.W.2d at 329. If the employer meets its burden, the employee must "demonstrate that the employer's articulated reason is pretextual." *Id.*

Here, the district court concluded that appellant's report of the illegal death protocol to her supervisors qualified as statutorily protected conduct. Respondent does not challenge this conclusion on appeal.

Next, the district court concluded that appellant did not suffer any adverse employment action. "To satisfy the adverse employment action element, the employee must establish the employer's conduct resulted in a material change in the terms or conditions of her employment. Mere inconvenience without any decrease in title, salary, or benefits, or only minor changes in working conditions does not meet this standard." *Leiendecker v. Asian Women United of Minn.*, 731 N.W.2d 836, 841-42 (Minn. App. 2007) (quotation and citation omitted), *review denied* (Minn. Aug. 7, 2007). Appellant argues that she suffered two adverse employment actions: (1) loss of overtime and its corresponding loss of compensation and (2) a "pattern of unwarranted discipline" that interfered with appellant's ability to perform her job and return to work.

At this rule 56 stage, there may be a genuine issue of material fact regarding whether appellant experienced an adverse employment action. Respondent's decision to

limit appellant's hours, and, by extension, her salary, may constitute "a material change in the terms or conditions of her employment" because appellant was previously allowed to work considerable overtime hours. *See id.* at 842. But we need not determine whether appellant experienced an adverse employment action because appellant has failed to establish a causal connection between her protected conduct and any such adverse employment actions.

The third element of a prima facie case of retaliation requires appellant to establish a causal connection between her protected conduct and respondent's adverse employment actions. See *Gee*, 700 N.W.2d at 555. Because "retaliatory motive is difficult to prove by direct evidence," "an employee may demonstrate a causal connection by circumstantial evidence that justifies an inference of retaliatory motive." *Cokley v. City of Otsego*, 623 N.W.2d 625, 632 (Minn. App. 2001), *review denied* (Minn. May 15, 2001). But any inference "must be reasonably supported by the available evidence; sheer speculation is not enough." *Id.* at 633.

Respondent argues that appellant cannot establish an inference of retaliatory motive because there is no evidence that Strief disciplined appellant in June 2011 in response to appellant's protected conduct. We agree. For present purposes, we must consider the facts in the light most favorable to appellant, who claims to have mentioned the death protocol at the 2011 triage meeting. *See STAR Ctrs.*, 644 N.W.2d at 76-77. But Strief was not present at this meeting, and the record after discovery reveals no evidence that Strief was informed of the content of appellant's remarks. Appellant vigorously argues that Strief's description of the triage meeting as "infamous" suggests that she

9

knew of appellant's complaint about the illegal death protocol. But that argument rests on speculation. Strief's description of the meeting as "infamous" suggests only that it was a meeting of which many people were aware, not that Strief knew the content of appellant's remarks. And Strief's initial discipline of appellant concerned appellant's inappropriate voicemail of June 13, at least two months after the triage meeting. Appellant merely speculates that the June 2011 discipline was based on her protected conduct some months earlier and prior to Strief becoming her supervisor, but this inference is not reasonably supported by the record. *See Cokley*, 623 N.W.2d at 633.

A causal connection may be demonstrated by "showing that the employer has actual or imputed knowledge of the protected activity and the adverse employment action follows closely in time." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 445 (Minn. 1983). But, to support a causal inference, the adverse employment action must occur soon after the protected activity. *See id.* (finding a causal connection when the employee was discharged two days after filing a complaint); *see also Smith v. Allen Health Sys., Inc.* 302 F.3d 827, 833 (8th Cir. 2002) (holding that a two-week interval was "barely" sufficient to establish causation in a claim under the FMLA); *Kipp v. Mo. Hwy. & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (holding that a two-month interval "so dilute[d] any inference of causation" that the employee could not establish causation as a matter of law in her Title VII claim). And intervening events can undermine an inference of a causal connection based on temporal proximity. *See, e.g.*, *Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 698 (8th Cir. 2006) (explaining that an employee, maintaining a sexual relationship with another employee, lying about it to management, and using a

company credit card to continue the relationship, undermined any inference that the employee was discharged for his earlier protected activity).

Appellant suggests that the proximity between when Strief learned of appellant's protected conduct and when she disciplined appellant establishes causation. But appellant must establish a causal connection between her protected conduct (not when Strief learned of the protected conduct) and respondent's adverse employment actions. *See Gee*, 700 N.W.2d at 555. The record does not reveal any adverse employment actions between when appellant made the complaint (the protected conduct) at the early-2011 triage meeting and the June 2011 discipline concerning appellant's voicemail. Despite the existence of a fact question regarding when respondent changed the death protocol, the record establishes, and appellant agreed at oral argument, that respondent quickly stopped enforcing the illegal policy. At least two months had passed between the triage meeting and the voicemail discipline, even if the triage meeting occurred as late as early April as appellant suggests. This timing is too attenuated to create a genuine issue of material fact concerning a causal connection in the absence of some record evidence of such a connection.

Appellant also suggests that respondent took escalating adverse and retaliatory action against her shortly after Strief learned of appellant's protected activity. The Eighth Circuit has stated that an employee can shorten the time gap by showing that the employer "took escalating adverse and retaliatory action against the employee." *Heaton v. The Weitz Co.*, 534 F.3d 882, 888 (8th Cir. 2008). Appellant's June 2011 discipline followed a voicemail fairly characterized by respondent as inappropriate. Then, nearly

11

six months passed before appellant received the December 2011 written warning. During that time, respondent took no disciplinary or other adverse employment action against appellant. Then, another six months passed before appellant requested her medical leave of absence. Appellant's leave began nearly one-and-one-half years after appellant's complaints to Wahlstrom about the illegal policy and at least one year after the triage meeting. And there is no dispute that respondent had discontinued the policy about which appellant had complained. Nothing in the record suggests that respondent's request in June 2012 that appellant make a decision regarding her employment status was related to appellant's much-earlier protected conduct. The record reveals no evidence that respondent fabricated or incited the family members' complaints regarding appellant's behavior. The record establishes several intervening and unrelated events over a one-year period leading up to the June 2012 meeting at which appellant's overtime hours were eliminated and at which she ultimately requested a medical leave of absence. *See Freeman*, 467 F.3d at 698. Appellant has not produced evidence sufficient to raise a genuine issue of material fact concerning the required causal connection.

Finally, appellant argues that she renewed her protected conduct each time she stated that respondent's actions were in retaliation for her protected conduct. According to appellant, she reported that she was being retaliated against for explaining that the death protocol was illegal "at every corrective action event that occurred." But reporting a suspicion that she was being retaliated against is different from renewing protected conduct. *Cf. Obst v. Microtron, Inc.*, 614 N.W.2d 196, 202-03 (Minn. 2000) (holding that because the employer was already aware of the violation, the employee's purpose

12

was not to expose an illegality or blow the whistle as "there was no whistle to blow," and the employee's report therefore did not fall within the MWA). Once the illegal policy was changed, as the parties agree that it was, the continued references to the earlier protected conduct were no longer reports of violations of law.[6] Because the record fails to reveal a genuine issue of material fact concerning any causal connection between appellant's protected activity and any adverse employment actions, the district court did not err in granting respondent's summary-judgment motion.

Although it is not necessary to our decision in light of the foregoing, we also observe that, even if we were to conclude that appellant has established a prima facie case of retaliatory action, "the burden of production shifts to [respondent] to articulate a legitimate, non-retaliatory reason for its action." *See Grundtner*, 730 N.W.2d at 329. Respondent has met this burden by providing clear and unequivocal evidence of appellant's behavioral and disciplinary history unrelated to appellant's protected complaints. Appellant has produced no evidence that respondent's reasons for discipline during and after June 2011 were pretextual. *See Shockency v. Jefferson Lines*, 439 N.W.2d 715, 719 (Minn. 1989) (explaining that an employee can establish pretext by showing "that the [employer's] proffered explanation is unworthy of credence"

---

[6] As stated above, the record suggests that the triage nurses were told not to follow the illegal policy at some point before April 2011. But an April 2012 email thread between the triage nurses reveals that the written policy was not changed until after April 2012. Even though the written policy was not immediately changed, there is no record evidence that respondent attempted to enforce the written policy. Instead, the triage nurses, including appellant, agreed in the April 2012 email thread that they had been told not to follow the written policy. After respondent verbally changed the policy and discontinued enforcing the written policy language, it had effectively changed the policy, and there was no further violation of law to report.

13

(quotation omitted)).  Even if appellant has established a prima facie case of retaliatory action, which we conclude she has not, she has not produced evidence sufficient to create a genuine issue of material fact concerning whether respondent's articulated non-retaliatory reasons for its actions were pretextual.  For this reason as well, the district court properly granted summary judgment to respondent.

**Affirmed.**